873 F.2d 1437
 13 Fed.R.Serv.3d 790
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
ARTCO CORPORATION, Plaintiff-Appellee,
v.
LYNNHAVEN DRY STORAGE MARINA, INC., and Lynnhaven Building
Supply Corporation, Defendants-Appellants.
ARTCO CORPORATION, Plaintiff-Appellant,
v.
LYNNHAVEN DRY STORAGE MARINA, INC.; Lynnhaven Building
Supply Corporation, Defendants-Appellees.
 Nos. 88-1335, 88-1344.
 United States Court of Appeals, Fourth Circuit.
 Argued: March 6, 1989.
Decided: April 10, 1989.
 
 Frederick T. Stant, III (Clark & Stant, P.C., on brief), for appellants.
 Janet E. Pitterle (Hogan & Hartson, on brief), for appellee.
 Before JAMES DICKSON PHILLIPS and CHAPMAN, Circuit Judges, and RICHARD L. WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Lynnhaven Dry Storage Marina appeals the District Court's verdict in favor of Artco Corporation on Lynnhaven's counterclaim for breach of contract. Artco cross-appeals, claiming that the District Court should have imposed sanctions on Lynnhaven under Fed.R.Civ.P. 11. We affirm the District Court's decision on Lynnhaven's counterclaim, but find that the trial court applied the wrong standard in evaluating Artco's Rule 11 motion. We therefore remand that portion of the District Court's decision for consideration in light of the proper standard.
 
 
 2
 In 1983, Artco agreed to build a four-story boat rack inside a building at Lynnhaven's marina, where Lynnhaven would store boats for a fee. The contract specified various characteristics of the rack, but the two specifications at issue here were set out not in the written contract but in blueprints that were incorporated as part of the contract. First, the blueprints specified the maximum capacity that the rack was to handle: up to 7,500 pound boats on the bottom two levels, 6000 pound boats on the third level, and 5,000 pound boats on the top rack. Artco was to provide 48 sets of racks, so the entire system was to hold 192 boats. Second, the blueprints bore the notation 'LSA SPREAD 42".' LSA stands for Lumber Support Assembly, which are wooden beams that support the boat in the rack.
 
 
 3
 Artco finished delivering materials in July 1983, and Lynnhaven finished building the rack in September. Shortly after Lynnhaven began placing boats in the rack, it noticed that the horizontal beams were "deflecting" (twisting) from the weight. Apparently the "channel" beams Artco had supplied were not strong enough, and after over two years of negotiations Artco agreed to replace the "channel" beams with 6 x 9 I-beams. Despite the disputes, Lynnhaven was using the rack with lighter boats, and Artco demanded some portion of the $32,971.56 purchase price. Lynnhaven refused.
 
 
 4
 Artco brought suit in state court in December of 1985 for breach of the 1983 contract, and Lynnhaven counterclaimed. That suit was settled in February of 1987 and dismissed without prejudice. The parties signed a settlement agreement under which Artco was to do more work on the rack (principally installing the 6 x 9 I-beams and doing some repainting), and Lynnhaven was to place $35,203 in escrow, to be paid to Artco when the work was done. The settlement agreement also provided that if the parties disagreed about the completion of the work, they would submit the dispute to a neutral third party whose decision would be binding. The settlement agreement specifically noted that neither party gave up any rights under the original contract.
 
 
 5
 Artco worked pursuant to the settlement agreement from March to May 1987. After the work was done, Lynnhaven still refused to pay, claiming that the new I-beams were not strong enough and that the vertical columns (which were still "channel" beams) would be too weak if Lynnhaven loaded the rack to capacity. As provided in the settlement agreement, the parties submitted the dispute to an engineer, Edward Pence, who examined the rack and concluded that Artco had fully performed under the settlement agreement.
 
 
 6
 Lynnhaven still would not pay, and Artco brought the federal suit that is now on appeal for the $35,203 that was in escrow (less $538.67 that ARtco owed Lynnhaven). Lynnhaven counterclaimed, seeking $66,333 to replace the 6"' I-beams with 8" I-beams, and $47,654 to shore up the vertical columns.
 
 
 7
 After a bench trial, the District Court entered judgment for Artco, ordering the escrow agent to release the funds and denying Lynnhaven's counterclaim. Artco had sued on the settlement agreement, and the Court easily found that Artco was entitled to the $34,664.33 because Pence's decision on Artco's work was binding. Although Lynnhaven apparently does not appeal that finding, the escrowed funds have not yet been delivered to Artco.
 
 
 8
 Lynnhaven does appeal the trial court's denial of the counterclaim, which was based on the original 1983 contract. Lynnhaven contends that neither the vertical columns nor the horizontal beams are strong enough to support the maximum capacity.
 
 Vertical columns
 
 9
 The parties agree that each vertical column was rated able to support 6,500 pounds, and that pursuant to American Institute of Steel Construction (AISC) standards, the vertical columns have a built-in safety factor of 1.92 (so that in theory a column rated at 6,500 pounds should be able to support 6,500 x 1.92 = 12,480 pounds). The dispute centers on how much weight could be expected to rest on a particular vertical column. Each column would have boats stored on either side of it, so if filled to capacity there would be four boats weighing 7,500 pounds, two weighing 6,000, and two weighing 5,000 resting in part on each column. However, the two 7,500 pound boats at the bottom are so close to the ground that they would not put much stress on the column. The other boats would total 37,000 pounds, and because there is a column on either side of each rack the maximum weight on a column (if all the boats rested on one end of the rack) would be 18,500 pounds.
 
 
 10
 Of course, the weight of the boats is distributed horizontally, so that one vertical column would never bear the entire 18,500 pounds. The parties disagree only on the proper assumption of weight distribution to use in designing the rack. Lynnhaven's expert, arguing that the fuel tanks and engine are usually in the back of the boat, assumed that 60% of the eight boats' weight might rest on one column. That would be 11,100 pounds (18,500 x 60%), considerably more than the 6,500 pound rating (though within the 1.92 safety factor). Artco's engineers assumed throughout the construction that 35% was a more reasonable expectation, and 35% of 18,500 pounds is 6,475 pounds, inside the 6,500 pound rating.
 
 
 11
 Lynnhaven argues that although the evidence showed Artco used the 35% figure, Artco presented no evidence that 35% was a proper assumption. Lynnhaven's expert, in contrast, testified that 60% was reasonable, and that engineers always design for the "worst case."
 
 
 12
 The District Court found that the vertical columns were not overstressed because the 35% figure was "more credible." Lynnhaven argues on appeal that since Artco presented no evidence that 35% was proper, and the only real evidence in the case was the expert testimony that 60% was reasonable, "the District Court was obliged to accept [Lynnhaven's expert's] testimony." This specious argument overlooks the fact that Lynnhaven bore the burden of proof, and if its expert was not a credible witness the District Court was free to conclude that Lynnhaven had not met its burden. The trier of fact is never "obliged" to accept a witness' testimony, even if it is the only evidence a party offers.
 
 
 13
 Moreover, the record supports the trial court's rejection of the expert's testimony. The 60% assumption was not based on industry standards or average boat weights, and indeed the expert admitted on cross examination that he had done no research but had adopted the assumption merely because he was told Lynnhaven's engineer had used it earlier. There was also evidence that the weight of heavier boats is more evenly distributed. Artco did not present an expert opinion that 35% was a more reasonable assumption, but the District Court had ample evidence to conclude that Lynnhaven had failed to meet its burden of proof.
 
 Horizontal beams
 
 14
 The lumber support assemblies, or LSAs, are attached to the horizontal beams of the rack. They can be adjusted back and forth along the horizontal beams to accomodate different sizes of boats with different hull shapes. Many of the boats that Lynnhaven stores require that the "spread" between the LSAs be 24 inches or less, and Lynnhaven claims that when the LSAs are that close together and the rack is loaded to capacity the horizontal beams (even the I-beam replacements) are overstressed.
 
 
 15
 The blueprints, which Lynnhaven reviewed and accepted, contain the notation 'LSA SPREAD 42".' Lynnhaven claims that this phrase is ambiguous, and should therefore be strictly construed against Artco, which drafted the document. We do not find the notation ambiguous. As the District Court found, all of the most relevant specifications for the rack system were outlined in the blueprints and not in the written contract. The blueprints show both the LSA notation and the maximum weight capacity of 7,500, 7.500, 6,000 and 5,000 pounds in each bay. When construed as a whole, therefore, the blueprints clearly convey the message that when the rack is loaded to capacity, the LSAs must be set 42 inches apart. The LSAs are adjustable so that the rack can carry boats requiring a short LSA spread, but the plans indicate that the rack can be fully loaded only when the LSAs are spread to 42 inches apart. Lynnhaven reviewed and approved these plans, and the District Court did not err in so interpreting them.
 
 Rule 11 Sanctions
 
 16
 After the trial court issued its ruling, Artco moved for Rule 11 sanctions, essentially arguing that Lynnhaven had acted in bad faith by opposing Artco's claim under the settlement agreement, which bound Lynnhaven to the third-party engineer's decision. The District Court denied Artco's motion, finding that Lynnhaven had not acted in bad faith as Artco had suggested. The Court likened the requirements of Rule 11 to "the inherent power of the Court to assess attorney's fees" when a losing party acts in bad faith. However, the 1983 amendment to Rule 11 explicitly removed the requirement that courts find bad faith before assessing sanctions, replacing that subjective test with an objective standard of reasonableness. See, e.g., Cabell v. Petty, 810 F.2d 463, 466 (4th Cir.1987); Fed.R.Civ.P. 11 advisory committee note (1983) (explicitly noting that amended Rule 11's scope extends beyond the "bad faith" cases cited in the District Court's opinion). The Rule requires the imposition of sanctions if an attorney files any pleading, even in good faith, that is not "well grounded in fact and ... warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." The pleading in question here, Lynnhaven's answer denying liability under the settlement agreement, may have violated Rule 11 even if it was signed in good faith. Because the District Court evaluated the Rule 11 motion under the overly strict standard suggested by Artco, we remand the case for reconsideration of that issue. We also remand with instructions to order the immediate release of the escrowed funds.
 
 
 17
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.